UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――――

HYDRAULIC RACE CO., INC.,
*et al*.,

                       Plaintiffs,

v.

CITY OF LOCKPORT, *et al*.,

                       Defendants.

―――――――――――――――――――――

**REPORT AND RECOMMENDATION**

Case No. 1:24-cv-857-JLS-JJM

       Plaintiffs Hydraulic Race Co., Inc., Hydraulic Race Co., Ltd., Niagara Zipper, LLC, Thomas Callahan, and Clarence Burkwit (together, "plaintiffs") commenced this action alleging constitutional violations and state law torts by defendants City of Lockport, Chief Building Inspector Jason Dool, former Mayor Michelle Roman, Police Chief Steven Abbott, and Common Council President Paul Beakman ("defendants") relating to the occurrence of a fatal accident at the Lockport Cave and Underground Boat Ride in Lockport, New York ("Lockport Cave"). Complaint [1].[1]

       At my direction [27], plaintiffs filed an Amended Complaint [29] to address the issues raised by defendants in their initial motion to dismiss. Before the court are defendants' motion to dismiss [35] the Amended Complaint pursuant to Fed R. Civ. P. ("Rule") 12(b)(6) and plaintiffs' cross-motion to strike [39] certain materials, which have been referred to me by District Judge Sinatra for initial consideration [15].

―――――――――――――――――――――

[1]     Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF pagination.

Having reviewed the parties' submissions [35, 39, 42, 43], and having heard oral argument on August 4, 2025, for the following reasons I recommend that the motion to dismiss be granted in part and denied in part, and that the cross-motion to strike be denied.

## BACKGROUND

Plaintiffs own and operate the Lockport Cave, which offers tours through historic man-made tunnels and a boat ride on an underground water system, as well as other attractions. [29], ¶¶8, 10, 30. On June 12, 2023, a fatal accident occurred on the Lockport Cave's underground boat ride attraction. Id., ¶¶33, 65. The tour boat capsized, sending all 28 passengers and the tour guide into the water. Complaint [1], ¶¶23, 27. Tragically, one of the passengers became trapped under the boat and died after he was unable to escape. Id., ¶28.[2]

Immediately following the incident, Lockport Police Chief Abbott declared the premises to be a crime scene. [29], ¶¶65, 146. This designation extended to all four acres of plaintiffs' property, including the visitor's center, the administrative offices, the zip line attraction, as well as outdoor adventure and viewing areas. Id., ¶66. In addition, at the direction of Chief Building Inspector Jason Dool, the electrical meters at the premises were removed and power to the entire location was disconnected. Id., ¶69.

Investigation of the incident was undertaken by a variety of local, state, and federal agencies. Id., ¶128. "[O]ver 100 personnel" from various agencies were present at the initial scene. Id. While the investigation was ongoing, plaintiffs were prevented from accessing the location or conducting business thereupon. Id., ¶¶73-74. The investigation lasted "over two months", concluding in approximately mid-August 2023. See id., ¶¶33, 76. Power was restored to the premises on August 10, 2023. Id., ¶78.

---

[2]    This information is omitted from the Amended Complaint, but I take judicial notice of it.

Plaintiffs allege that, during the closure, defendants Abbott, Dool, and other City officials unlawfully entered the premises, conducted unauthorized searches, and seized digital surveillance footage and other unidentified materials. Id., ¶¶122-25, 129-32. Plaintiffs also allege that defendants failed to maintain and secure the premises during the shutdown, resulting in break-ins and damages to underground facilities, deterioration of historical elements, and interruption of ongoing preservation efforts. Id., ¶81.

Plaintiffs allege a "pattern of harassment and retaliation" by defendants against them, due to being "outspoken critics of the City's regulatory practices", and that defendants "exploit[ed]" the June 2023 incident to further harass and retaliate against them. Id., ¶¶40, 80. Previous "harassment and retaliation" included delays and interference with zoning approvals, denial of permits, assessment of baseless safety violations, and attempting to prevent plaintiffs' zipper line attraction from opening. Id., ¶¶42-43. In August 2013, defendant Dool ordered an unauthorized excavation of plaintiffs' property. Id., ¶¶44-51. The City and defendants also allegedly obstructed plaintiffs' access to public records requested in accordance with New York's Freedom of Information Law ("FOIL") on multiple occasions, including with respect to the June 2023 incident and investigation. Id., ¶¶52-61.

On September 12, 2023, plaintiffs filed two notices of claim with the City of Lockport. Id., ¶18. An examination under oath of plaintiff Thomas Callahan pursuant to General Municipal Law §50-h was conducted on March 26, 2024. Id., ¶27.

On September 12, 2024, plaintiffs commenced this action by filing a Complaint asserting 14 claims against defendants. [1] at 31-48. At my direction, plaintiffs filed an Amended Complaint, asserting nine claims, including violations of procedural and substantive due process,

-3-

unlawful taking, abuse of process, conspiracy, retaliation, <u>Monell</u> violations, unreasonable search and seizure, tortious interference, and defamation. [29] at 34-52.

## DISCUSSION

### A.    Dismissal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); *see* <u>Keiler v. Harlequin Enterprises Ltd.</u>, 751 F.3d 64, 68 (2d Cir. 2014). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. This "plausibility standard" requires that the plaintiff state "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). On a Rule 12(b)(6) motion, "the movant bears the burden of proof". <u>Alce v. Wise Foods, Inc.</u>, 2018 WL 1737750, *2 (S.D.N.Y. 2018).

"Generally, [the court does] not look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken". <u>Goel v. Bunge, Ltd.</u>, 820 F.3d 554, 559 (2d Cir. 2016). "[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under [Rule] 56 and afford all parties the opportunity to present supporting material." <u>Friedl v. City of New York</u>, 210 F.3d 79, 83 (2d Cir. 2000).

**B.    Qualified Immunity**

Defendants argue that they are entitled to qualified immunity because plaintiffs fail to establish the violation of a "clearly established statutory or constitutional right" with respect to their actions in shutting down the Lockport Cave and disconnecting the power. [35-6] at 14-18. Plaintiffs argue that the qualified immunity argument is premature and, in any event, unwarranted as defendants violated their clearly established rights. [39-6] at 4-8.

Qualified immunity shields government officials from liability for violation of a right under federal law if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known". Matzell v. Annucci, 64 F.4th 425, 433-34 (2d Cir. 2023) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). However, qualified immunity "faces a formidable hurdle" at the motion to dismiss stage, "and is usually not successful". Sabir v. Williams, 52 F.4th 51, 64 (2d Cir. 2022). This is because a plaintiff "need not plead facts showing the absence of such a defense" in the complaint. Castro v. United States, 34 F.3d 106, 111. Nonetheless, I will address qualified immunity as necessary as to each claim.

**C.    Procedural Due Process**

Plaintiffs first assert that defendants Abbott, Roman, and Dool violated their procedural due process rights by seizing the entirety of the Lockport Cave and surrounding property, cutting the electric service, and excluding them from the premises for nearly two months without a hearing, appeals process, or other post-deprivation remedy. Amended Complaint [29], ¶¶181-96.

The Due Process Clause of the Fourteenth Amendment makes it unlawful for any state to "deprive any person of life, liberty, or property, without due process of law". U.S. Const.

amend. XIV, §1. Thus, the Due Process Clause does not necessarily prohibit the deprivation of such rights, "only . . . deprivations without due process of law". Rivera-Powell v. New York City Board of Elections, 470 F.3d 458, 464 (2d Cir. 2006). A procedural due process claim entails a two-step analysis: "[w]e first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient". Swarthout v. Cooke, 562 U.S. 216, 219 (2011); see Victory v. Pataki, 814 F.3d 47, 59 (2d Cir. 2016). As the first element (i.e., plaintiffs' property interest) is uncontested, the court may proceed to the second.

Generally, due process requires "notice and an opportunity to be heard before the Government deprives them of property". United States v. James Daniel Good Real Property, 510 U.S. 43, 48 (1993). However, "in certain circumstances, the lack of such predeprivation process will not offend the constitutional guarantee of due process, provided there is sufficient postdeprivation process". Catanzaro v. Weiden, 188 F.3d 56, 61 (2d Cir. 1999) (citing Parratt v. Taylor, 451 U.S. 527, 538 (1981)). Such circumstances include "[w]here there is an emergency requiring quick action". WWBITV, Inc. v. Village of Rouses Point, 589 F.3d 46, 50 (2d Cir. 2009) (citing Parratt, 451 U.S. at 539).

Plaintiffs do not dispute that June 12, 2023 incident - which involved an underground boat capsizing and a drowning death - was an emergency. Rather, they contend that defendants' seizure of the property was unjustified in its scope and duration. They also argue that defendant Police Chief Abbott's designation of the premises as a "crime scene" was unlawful, as it was not authorized by a judicial warrant - but that issue is more properly considered with plaintiffs' claim of unreasonable search and seizure.

-6-

Defendants respond that no pre-deprivation process was required in this emergency situation, and that adequate post-deprivation process existed, namely, an Article 78 proceeding. [35-6] at 18-23. "Article 78 of the New York Civil Practice Law, an amalgam of the common law writs of certiorari to review, mandamus, and prohibition, provides both a hearing and a means of redress for petitioners." Hellenic American Neighborhood Action Committee v. City of New York, 101 F.3d 877, 881 (2d Cir. 1996); *see generally* N.Y. C.P.L.R. §§7801; 7803. The Second Circuit has held that "an Article 78 proceeding is a perfectly adequate postdeprivation remedy", where (as here) there is a deprivation as the result of allegedly "unauthorized" or "arbitrary" acts of a state employee. Hellenic, 101 F.3d at 881; *see also* Beechwood Restorative Care Center v. Leeds, 436 F.3d 147, 156-57 (2d Cir. 2006).

In Lilakos v. New York City, 808 Fed. App'x 4 (2d Cir. 2020) (Summary Order), the City of New York issued an emergency vacate order against the plaintiffs' home for allegedly operating an illegal hostel. Id. at 7. Plaintiffs unsuccessfully challenged the underlying violations before an administrative board, and then appealed to the Office of Administrative Trials and Hearings, which issued a decision upholding most of the violations. Id. Plaintiffs commenced two Article 78 proceedings challenging the administrative decision and the vacate order. Id. Those petitions were denied by the state court. Id.

In the ensuing federal court action, the district court denied plaintiffs' claim that procedural due process was violated. Id. The Second Circuit affirmed, stating "[w]e have held on numerous occasions that an Article 78 proceeding is a perfectly adequate post-deprivation remedy". Id. at 10. The court found that plaintiffs could have directly challenged the vacate order (which was not subject to administrative review) by way of an Article 78 proceeding, and that any delay in doing so was attributable to them. Id. at 9-10. The court also noted that there were

other avenues available to plaintiffs to return to the property, such as correcting the violations or posting a security, which they also declined to do. Id. at 10. Thus, the court found that the requirements of procedural due process were satisfied. Id.

In Weinberger v. Town of Fallsburg, 2019 WL 481733 (S.D.N.Y. 2019), the town condemned a rental property for various safety violations, such as a lack of smoke detectors, exposed wiring, and arcing outlets, without pre-deprivation notice or a hearing. Id. at *2. The district court agreed that "no pre-deprivation process is necessary when government officials temporarily condemn property that they determine to be a danger to the public's safety". Id. at *6. Similar to Lilakos, the court found that the availability of the Article 78 process, as well as the ability to simply correct the deficiencies and request re-inspection, meant that plaintiff was not deprived of "meaningful process". Id. at *8.

Plaintiffs argue that an Article 78 proceeding would have been inappropriate and inadequate because Article 78 is only for "routine administrative determinations", and that such a proceeding would have been "subject to significant procedural delays". [39-6] at 8-11. However, the cases discussed above hold that Article 78 proceedings are indeed an adequate post-deprivation remedy for the "unauthorized" or "arbitrary" acts of a government employee, as plaintiffs allege. See Beechwood, 436 F.3d at 156-57; Hellenic, 101 F.3d at 881. Any assumptions about "procedural delays" associated with such a proceeding are unsupported speculation where, as here, such relief was never pursued.

Neither party cites a case precisely like this one, wherein a petitioner was (or was not) able to challenge a police designation of a "crime scene" via an Article 78 proceeding. Nor do I find one. Obviously, a crime scene designation entails considerations other than public safety, though safety does appear to have been among defendants' concerns. I am also mindful

that, unlike in Lilakos and Weinberger, plaintiffs appear to have had no recourse short of judicial intervention, such as by remedying the apparent electrical issues.[3]

Still, courts that have been presented with the issue have consistently held that "an Article 78 proceeding is sufficient post-deprivation process for an unauthorized deprivation of property". G.I. Home Developing Corp. v. Weis, 499 F. App'x 87, 89 (2d Cir. 2012) (Summary Order); *see also* McCrae v. Town of Brookhaven, 759 F. Supp. 3d 372, 395 (E.D.N.Y. 2024) ("courts in this circuit have consistently held that New York state law provides an adequate post-deprivation remedy for property seizures"); Palmer v. City of New York, 564 F. Supp. 3d 221, 249 (E.D.N.Y. 2021) (same); Melmarkets, Inc. v. Dillon, 80 A.D.2d 839, 839 (2d Dept. 1981) ("an article 78 proceeding in the nature of mandamus is an appropriate vehicle to compel the return of property seized by the police").

Plaintiffs' arguments to the contrary are unpersuasive. While they mention potential delay as a reason that an Article 78 proceeding would have been unsatisfactory or inadequate, there is nothing to suggest that they actually considered commencing such an action or explored any expedited relief. In fact, it is not clear what efforts plaintiffs undertook during the two-month closure to regain possession of the premises, other than making some unspecified "requests for information and intervention". Amended Complaint [29], ¶¶86, 87, 189. In sum, "[p]laintiffs have not articulated any reason why an Article 78 proceeding was an inadequate post-deprivation remedy", and thus their procedural due process claim should be dismissed. Viteritti v. Inc. Village of Bayville, 918 F. Supp. 2d 126, 134 (E.D.N.Y. 2013).

---

[3]    Defendants suggest that plaintiffs could have appealed Dool's "decision" to the City's Minimum Standards and Appeal Board ([35-6], *citing* Lockport City Code §§89-8; 89-18), but do not suggest that doing so, by itself, would have restored plaintiffs to possession of the premises.

D.    **Substantive Due Process**

Plaintiffs assert that defendants' actions with respect to the closure were targeted and retaliatory, and thus violated their right to be free from arbitrary government oppression. [39-6] at 11-13. Defendants argue that the alleged conduct was not sufficiently outrageous or egregious to "shock the contemporary conscience", and that these claims are duplicative of other constitutional claims. [35-6] at 23-24. I agree with defendants.

In contrast to procedural due process, the doctrine of substantive due process "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them". Zinermon v. Burch, 494 U.S. 113, 125 (1990). Substantive due process protects against "government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense". Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995). "For a substantive due process claim to survive a Rule 12(b)(6) dismissal motion, [plaintiff] must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience'." Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005) (*quoting* County of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8 (1998)).

"The measure of what is conscience-shocking is no calibrated yard stick." Sacramento, 523 U.S. at 847; *see* Johnson v. Newburgh Enlarged School District, 239 F.3d 246, 252 (2d Cir. 2001). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Sacramento, 523 U.S. at 849; *see* Benzman v. Whitman, 523 F.3d 119, 126-27 (2d Cir. 2008). "This is so because our constitutional notion of due process rests on the bedrock principle that we must protect the individual 'against the exercise of power without any reasonable justification

in the service of a legitimate governmental objective'." Velez, 401 F.3d at 94 (*quoting*

Sacramento, 523 U.S. at 845-46).

Despite plaintiffs' allegations of antipathy and unfair treatment by defendants, I

cannot conclude that defendants' actions in taking control of and closing off the Lockport Cave

after a fatal accident were "unjustifiable by any government interest". Nor does their seizure of

the premises, even if overbroad in scope and duration, "shock the contemporary conscience".

*See*, *e.g.*, Carter v. Campanelli, 2022 WL 1667022, *2 (E.D.N.Y. 2022) ("[the defendant police

officer] appears to have had a valid basis for impounding the plaintiff's car, so his conduct was

neither 'egregious' or 'outrageous'") (citing cases).

It is worth remembering that substantive due process "is not a 'font of tort law'"

and "does not provide a comprehensive scheme for determining the propriety of official conduct

or render all official misconduct actionable". Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005)

(*quoting* Sacramento, 523 U.S. at 848). While defendants' alleged conduct may have been

unlawful in some respects, that does not necessarily mean that plaintiffs can state a claim under

substantive due process.

More critically, "where another provision of the Constitution provides an explicit

textual source of constitutional protection, a court must assess a plaintiff's claims under that

explicit provision and not the more generalized notion of substantive due process". Conn v.

Gabbert, 526 U.S. 286, 293 (1999); *see* Hu v. City of New York, 927 F.3d 81, 104 (2d Cir.

2019). Accordingly, where a due process claim is duplicative of a more specific claim under the

federal constitution, it "is either subsumed in [the] more particularized allegations, or must fail".

Velez, 401 F.3d at 94.

Plaintiffs' list of grievances against defendants sound variously in unreasonable search and seizure, First Amendment retaliation, defamation, and trespass. *See* [29], ¶¶200-14. Those claims will stand or fall on their own merits. Meanwhile, plaintiffs' substantive due process claim is duplicative of those claims and should be dismissed. *See, e.g.*, McCrae, 759 F. Supp. 3d at 395 ("[plaintiff's] substantive due process claims related to his alleged false . . . seizure of property merge with his Fourth Amendment claims and are thus barred").

**E.    Unlawful Taking**

Plaintiffs assert that the closure of their premises by defendants constituted an unlawful taking in violation of the Fifth Amendment. [29], ¶¶215-26. Plaintiffs argue that their exclusion from the property is cognizable as a taking because it deprived plaintiffs of all economically beneficial use. [39-6] at 14-17. Defendants argue the two-month designation as a crime scene did not constitute a taking as it was neither permanent nor for public use. [35-6] at 24-25.

I recognize that "takings temporary in duration can be compensable". Arkansas Game & Fish Commission v. United States, 568 U.S. 23, 32 (2012). "[I]f government action would qualify as a taking when permanently continued, temporary actions of the same character may also qualify as a taking." Id. at 26. However, "the extreme categorical rule that any deprivation of all economic use, no matter how brief, constitutes a compensable taking surely cannot be sustained. Petitioners' broad submission would apply to numerous 'normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like,' . . . ***as well as to orders temporarily prohibiting access to crime scenes***, businesses that violate health codes, fire-damaged buildings, or other areas that we cannot now foresee. Such a rule would undoubtedly require changes in numerous practices that have long been considered permissible

-12-

exercises of the police power". Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 334-35 (2002) (emphasis added).

As the Supreme Court has recently reiterated, "many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights". Cedar Point Nursery v. Hassid, 594 U.S. 139, 160 (2021). For example, "[u]nder this framework, government health and safety inspection regimes will generally not constitute takings." Id. Federal courts have applied similar logic to seizures by police. See AmeriSource Corp. v. U.S., 525 F.3d 1149, 1153 (Fed. Cir. 2008) ("[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause."); Acadia Technology, Inc. v. U.S., 458 F.3d 1327, 1331 (Fed. Cir. 2006) (government seizure of property as evidence in a criminal proceeding or as the suspected instrumentality in a crime does not constitute a taking for Fifth Amendment purposes).

In light of these explicit carve-outs by the courts, I conclude that plaintiffs' allegations are not cognizable under the Takings Clause.

F.    **Unreasonable Search and Seizure**

Plaintiffs assert that defendant Police Chief Abbott effected an unlawful seizure by designating the Lockport Cave and surrounding properties a "crime scene" and closing the premises for over two months without a warrant or judicial authorization. [29], ¶¶266-73. They also allege that, during that period, Abbott directed officers to conduct unauthorized searches and seizures on the premises and allowed access to unspecified third parties. Id., ¶¶275-78. Plaintiffs further allege that, on June 13, 2023, defendant Building Inspector Dool unlawfully entered the premises and conducted search and seizure of its electrical equipment. Id., ¶¶274, 282.

Defendants argue that the "emergency exception" to the warrant requirement applied due to the fatal accident. [35-6] at 32-33. Defendants also argue that Dool properly entered the premises in connection with the emergency and the electrical defects he observed were in plain sight. Id. at 33-34. As such, they argue, it was reasonable for Abbot and Dool to conclude the premises were unsafe and that criminal activity was possible. Id. at 34. Finally, defendants argue there is no allegation of defendants Roman or Beakman being personally involved in any search or seizure. Id. at 34-35.

The Fourth Amendment prohibits "unreasonable searches and seizures", and this provision "protects commercial buildings as well as private homes". Marshall v. Barlow's, Inc., 436 U.S. 307, 311 (1978).[4] "[S]earches and seizures conducted without a warrant are presumptively unreasonable." United States v. McCargo, 464 F.3d 192, 196 (2d Cir. 2006). However, "several exceptions to the warrant requirement have been fashioned when circumstances demand an immediate police response". Id. One such exception is "an emergency situation demanding immediate action". Mincey v. Arizona, 437 U.S. 385, 392-93 (1978). Defendants argue that the emergency exception applies here. [35-6] at 32-34.

Plaintiffs do not seriously contest that the June 12th incident was an emergency, but they argue that defendants' intrusion on their Fourth Amendment rights exceeded the scope of that emergency and continued long after it subsided. [39-6] at 27-28. The Supreme Court has held that while "[w]e do not question the right of the police to respond to emergency situations . . . a warrantless search must be 'strictly circumscribed by the exigencies which justify its

---

[4]    The fact that a property is commercial as opposed to residential may have implications on the expectations of privacy. See, e.g., United States v. McKenzie, 13 F.4th 223, 235 (2d Cir. 2021); New York v. Burger, 482 U.S. 691, 700 (1987) ("[a]n expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home"). However, that distinction is not raised by defendants nor does it appear directly relevant at this stage.

initiation.'" <u>Mincey</u>, 437 U.S. at 392-93. In all cases, "the ultimate touchstone of the Fourth

Amendment is 'reasonableness'". <u>Riley v. California</u>, 573 U.S. 373, 381-82 (2014).

   At this pre-discovery stage, the scope of the exigencies presented by the June 12th

incident and the reasonableness of any particular search or seizure conducted on the premises are

unclear. However, plaintiffs plausibly allege that defendants Abbott and Dool's actions exceeded

the scope and duration of any search or seizure justified by the emergency. Plaintiffs allege that

defendant Abbott designated the premises, in its entirety, a crime scene. [29], ¶¶65, 146, 184,

271. That designation remained in place for over two months. <u>Id.</u>, ¶¶33, 76, 190, 273. Plaintiffs

further allege that defendants Abbott and Dool conducted and/or directed additional searches and

seizures on the property through July of 2023. <u>Id.</u>, ¶¶274-76. Plaintiffs assert that no warrant or

judicial authorization was ever obtained authorizing these actions, and defendants do not suggest

otherwise. <u>Id.</u>, ¶¶75, 122, 184, 271, 274. These allegations, taken at face value, suffice to state

plausible violations of the Fourth Amendment.

   To begin with, there is no general "crime scene" exception to the requirements of

the Fourth Amendment. *See* <u>Flippo v. West Virginia</u>, 528 U.S. 11, 14 (1999); <u>Mincey</u>, 437 U.S.

at 395 ("the 'murder scene exception' created by the Arizona Supreme Court is inconsistent with

the Fourth and Fourteenth Amendments"). An officer conducting a warrantless search or seizure

"must have probable cause to believe an exigency exists", such as the need to "'render

emergency assistance to an injured occupant,' 'protect an occupant from imminent injury,'

'prevent the imminent destruction of evidence,' or 'prevent a suspect's escape'". <u>Alexander v.

City of Syracuse</u>, 132 F.4th 129, 147 (2d Cir. 2025) (*quoting* <u>Lange v. California</u>, 594 U.S. 295,

301-02 (2021)).

Assuming that an exigency is established, "any warrantless searches and seizures must be 'strictly circumscribed' to ameliorate the exigency at issue". Id. "[O]nce the exigency ends, any additional warrantless search or seizure 'is no longer permissible'." Id.; *see also* United States v. Cosme, 796 F.3d 226, 235 (2d Cir. 2015) (the exigent circumstances exception "does not immunize . . . lengthy, warrantless seizure[s]").

Defendants' citation to Capozzi v. City of Olean, N.Y., 910 F. Supp. 900 (W.D.N.Y. 1995) does not compel a different result. In that case, the court found that a warrantless entry by police and firefighters who were concerned for an elderly man's well-being was justified by exigent circumstances. Id. at 908. Officials found the man and took notice of the "terrible condition" of the home, including the lack of heat in the December cold, a collapsing ceiling, and scattered debris. Id. at 905. The code enforcement officer was called to inspect the house due to concern for its safety, and he determined the home to be uninhabitable. Id. The court rejected the homeowner's Fourth Amendment claim against the city officials, holding that: "[o]nce inside the house lawfully, under the plain view exception to the warrant requirement, it was proper for [the code enforcement officer] to remain in the house to inspect the structure". Id. at 908.

In that regard, defendants are correct that any defects Building Inspector Dool observed "in plain view" upon responding to the emergency and any related enforcement actions were likely permissible under the Fourth Amendment. *See* Mincey, 437 U.S. at 393 ("police may seize any evidence that is in plain view during the course of their legitimate emergency activities"). However, plaintiffs here allege that Dool returned to the premises on June 13, 2026, and entered other non-public areas such as storage facility and administrative offices. [29], ¶274.

They further allege that Abbott directed unauthorized searches "throughout June and July 2023". Id., ¶275.

Moreover, plaintiffs allege that Abbott designated the premises a "crime scene" and relied on that continuing designation to maintain control of the premises and exclude plaintiffs therefrom for over two months. Id., ¶¶33, 65, 76, 146, 184, 190, 271, 273. While City officials, such as Building Inspector Dool, might have had the authority to order the closure of the premises administratively on public safety grounds, that is not the means they allegedly chose to employ. See id., ¶146 ("immediately following the incident, Police Chief Abbott stated to the media: 'We have one individual who has passed, we have a lot of questions that need to be answered. Whether or not that leads to charges in the future, I do not know, but as of right now we're treating it as a crime scene'").

Having proceeded on the grounds of a criminal investigation, defendants were required to obtain a judicial warrant to continue any searches or seizure after the exigent circumstances subsided. See Alexander, 132 F.4th at 147; Mincey, 437 U.S. at 393-95. While there are no hard-and-fast rules regarding how long exigent circumstances can last, two months is far beyond was is typically considered reasonable. See Mincey, 437 U.S. at 393 ("a *four-day search* that included opening dresser drawers and ripping up carpets can hardly be rationalized in terms of the legitimate concerns that justify an emergency search") (emphasis added). For all these reasons, I recommend that defendants' motion to dismiss be denied as to defendants Abbott and Dool.

Nevertheless, I agree with defendants that this claim should be dismissed as to defendants Roman and Beakman for lack of personal involvement. "[T]o establish a defendant's individual liability in a suit brought under §1983, a plaintiff must show . . . the defendant's

personal involvement in the alleged constitutional deprivation." <u>Kravitz v. Purcell</u>, 87 F.4th 111, 129 (2d Cir. 2023). Plaintiffs must establish that each defendant violated their constitutional rights though their own conduct, "not by reason of [defendant's] supervision of others who committed the violation". <u>Tangreti v. Bachmann</u>, 983 F.3d 609, 619 (2d Cir. 2020).

Plaintiffs' allegation that former Mayor Roman "approv[ed] and ratif[ied]" the prolonged seizure of the premises ([29], ¶281) is insufficient. As Roman lacked the authority to authorize searches or seizures, it is unclear what this allegation means. "To avoid a finding that allegations . . . are conclusory and thus insufficient to state a claim, a plaintiff must also allege a "factual basis" to demonstrate defendant's personal involvement in the alleged constitutional deprivation." <u>Flannery v. County of Niagara</u>, 763 F. Supp. 3d 364, 402 (W.D.N.Y. 2025). Without a more specific description of Roman's actions, the allegation against her fails as a conclusory attempt to characterize her passive concurrence with Abbott and Dool's actions as active conduct.

Furthermore, there is no allegation that defendant Beakman had any involvement with any search and seizure. Therefore, plaintiffs' claim for unreasonable search and seizure should be dismissed as against those defendants.

## G.    First Amendment Retaliation

Plaintiffs allege that defendants retaliated against them for "[c]riticizing the City of Lockport's zoning, permitting, and regulatory decisions", "[p]ublicly challenging the City's delays and interference with Plaintiffs' historic preservation and tourism projects", "[f]iling formal complaints and participating in public meetings", and "[s]ubmitting FOIL requests and asserting their rights to public information". [29], ¶242. Such retaliation took the form of "improperly designat[ing] the entirety of Plaintiffs' business premises as a crime scene", "the

removal of electrical meters and the shutdown of power to unrelated areas", and "issu[ing] public statements falsely suggesting that Plaintiffs lacked proper safety measures and operated recklessly". Id., ¶243. Defendants argue that plaintiffs fail to establish that a retaliatory motive was the "but for" cause of the complained-of government actions. [35-6] at 28-30.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech". Nieves v. Bartlett, 587 U.S. 391, 398 (2019) (quotations omitted). "To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. County of Nassau, 732 F.3d 157, 160 (2d Cir. 2013).

There is no dispute that the statements referenced by plaintiffs are protected speech, and that at least some of defendants' actions were injurious to plaintiffs. Thus, the only issue at this stage is whether defendants' actions were "motivated or substantially caused" by plaintiffs' protected speech. "To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury'." Nieves, 587 U.S. at 398.

"Recognizing the difficulty inherent in establishing adverse parties' motives before discovery, the Second Circuit has held that, for the purposes of a complaint, 'it is sufficient to allege facts from which a retaliatory intent reasonably may be inferred.'" Agnew v. D'Amore, 2025 WL 1455526, *9 (N.D.N.Y. 2025) (quoting Dougherty v. Town of North Hempstead Board of Zoning Appeals, 282 F.3d 83, 91 (2d Cir. 2002)). As defendants point out, the official's retaliatory motive "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive". Nieves, 587 U.S.

at 399 (*citing* <u>Hartman v. Moore</u>, 547 U.S. 250, 256 (2006) (recognizing that although it "may be dishonorable to act with an unconstitutional motive," an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway")).

  To be sure, plaintiffs' retaliation claim has causation issues. While plaintiffs are correct that temporal proximity can support an inference of retaliation at the pleadings stage, they fail to specify when any protected speech occurred. *See* Amended Complaint [29], ¶242 (alleging merely that such statements were made "[p]rior to and following the June 12, 2023 incident"). They allege an acrimonious relationship with City officials dating back to the "early 1990s". <u>Id.</u>, ¶¶40-64. Flare-ups occurred again in "the early 2000s", in 2013, and in 2018. <u>Id.</u>, ¶¶43, 44. The most recent conflict cited by plaintiffs occurred in 2020, wherein the City allegedly cited "unfounded zoning restrictions" to prevent the launch of their "Niagara Zipper" attraction. <u>Id.</u>, ¶43. The only specifically referenced incident in which plaintiffs spoke critically of the City is alleged to have occurred in 2013, in response to an alleged unauthorized excavation on plaintiffs' property. *See* <u>id.</u>, ¶¶47-48,

  Nonetheless, "[i]f an official takes adverse action against someone based on [a] forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." <u>Nieves</u>, 587 U.S. at 399 (citations omitted). As above, my conclusion hinges on defendants' apparent insistence on treating the premises as a "crime scene" rather than relying on some sort of administrative or judicially sanctioned means of seizing the property. The four corners of the complaint do not supply any justification for such a designation. While such

justification may become clear in discovery, defendants' say-so is not sufficient at this point to establish that such treatment would have occurred absent any retaliatory animus.

Plaintiffs have alleged actions and statements by defendants which are susceptible to the interpretation that defendants harbored some retaliatory animus against plaintiffs. *See* Handsome, Inc. v. Town of Monroe, 2024 WL 2747142, *5 (2d Cir. 2024) (Summary Order) ("'particularized evidence' that suggests a retaliatory motive, such as 'expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken'").

Drawing all reasonable inferences in favor of the nonmovants, the Amended Complaint plausibly alleges that defendants' injurious actions were motivated or substantially caused by plaintiffs' exercise of the right to engage in protected speech.

## H.     Conspiracy

Plaintiffs assert a claim against all the individual defendants for conspiracy to violate their constitutional rights. [29], ¶¶227-40. As an initial matter, a §1983 conspiracy claim requires an underlying constitutional violation. *See* Oliver v. Penny, 2022 WL 2165814, *3 (2d Cir. 2022) (Summary Order); Fiedler v. Incandela, 222 F. Supp. 3d 141, 165 (E.D.N.Y. 2016) ("it is well established that 'a § 1983 conspiracy claim fails as a matter of law where there is no underlying constitutional violation'"). As I recommend dismissal of plaintiffs' due process and takings claims, any conspiracy claim premised on alleged violations of those provisions should be dismissed as well.

Defendants argue that plaintiffs' conspiracy claim is barred by the "intracorporate conspiracy doctrine" as they are all employees of the City of Lockport. [35-6] at 26-28. "The intra-corporate conspiracy doctrine provides that defendants working for the same employer are

legally incapable of conspiring together when the offending conduct occurred within the scope of their employment." Massari v. Ryerse, 2024 WL 2116827, *18 (W.D.N.Y. 2024) (citations omitted). While "[t]o date, the Second Circuit has not yet applied the doctrine in §1983 cases . . . courts in this circuit have applied the doctrine". McCrae, 759 F. Supp. 3d at 396 (citations omitted) (citing cases). As defendants here are all employees of the same municipality, the doctrine would normally apply absent an exception. See Massari, 2024 WL 2116827 at *18; Broich v. Village of Southampton, 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009).

Plaintiffs argue that an exception to the doctrine applies because each defendant personally harbored retaliatory animus and bias against them due to plaintiffs having previously criticized them. [39-6] at 18-19. A "personal stake" exception to the intracorporate conspiracy doctrine exists when it is established that defendants were "pursuing personal interests wholly separate and apart from the entity". Ali v. Connick, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015); see Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013) ("an exception to the intracorporate conspiracy doctrine exists when the alleged conspirators are motivated by an improper personal interest separate and apart from that of their principal"). While the exception can be quite broad, "more is required of a plaintiff than simply alleging that the defendants were motivated by personal bias against the plaintiff". Medina v. Hunt, 2008 WL 4426748, *8 (N.D.N.Y. 2008).

Here, plaintiffs allege that the "conspiracy was motivated by personal animus [and] prior conflicts". [29], ¶230. They go on to allege that these actions were part of "the City's pattern of hostility and retaliation toward Plaintiffs, who had previously challenged the City's regulatory interference and zoning practices". Id. That would seem to suggest that defendants were acting together in the interests of the City, rather than any interest "separate and apart"

therefrom. The "personal stake" exception generally applies where a government official acts in their own interest "in order to secure personal benefit". <u>Chamberlain</u>, 986 F. Supp. 2d at 388 (citation omitted); <i>see also</i> <u>Ali</u>, 136 F. Supp. 3d at 283 (giving examples). While defendants may have harbored personal antipathy against plaintiffs, there is nothing to suggest they had anything to gain personally from subjecting them to the alleged constitutional violations.

More generally, "[t]o prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." <u>Pangburn v. Culbertson</u>, 200 F.3d 65, 72 (2d Cir. 1999); <i>see also</i> <u>Fiedler</u>, 222 F. Supp. 3d at 165. "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." <u>Pangburn</u>, 200 F.3d at 72 (quotations omitted). Nevertheless, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." <u>Ciambriello v. County of Nassau</u>, 292 F.3d 307, 325 (2d Cir. 2002) (quotations omitted). The complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made". <u>Twombly</u>, 550 U.S. at 556.

While plaintiffs allege that "[d]efendants participated in ongoing communications, meetings, and public statements supporting the enforcement actions, indicating a clear meeting of the minds" ([29], ¶237), any such communications and meetings would have necessarily occurred <i>after</i> the June 12th incident and government occupation of the premises. Plaintiffs assert that defendants had "conspired to unlawfully shut down and seize control of [their] businesses" (<u>id.</u>, ¶229), but the shutdown and seizure was clearly precipitated by the June 12th accident, not by any action of the defendants. There is nothing in the Amended Complaint

to support the existence of an agreement among defendants to injure plaintiffs in this manner

prior to the June 12th incident. To the extent the allegations suggest an agreement subsequent to

the June 12th incident, such communications fall squarely within the ambit of the intracorporate

conspiracy doctrine.

   For these reasons, I recommend that defendants' motion to dismiss be granted as

to plaintiff's conspiracy claim.

## I. <u>Monell</u> Claim

   Plaintiffs allege that the City had a custom or policy of targeting them and their

businesses with selective enforcement, obstruction, and retaliation. [29], ¶¶255-65. Under

<u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), a municipality may be liable

under §1983 "if the deprivation of the plaintiff's rights under federal law is caused by a

governmental custom, policy, or usage of the municipality." <u>Jones v. Town of East Haven</u>, 691

F.3d 72, 80 (2d Cir. 2012). Thus, "[t]he elements of a <u>Monell</u> claim are (1) a municipal policy or

custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional

right". <u>Agosto v. New York City Department of Education</u>, 982 F.3d 86, 97 (2d Cir. 2020).

   Defendants first argue that the third element, constitutional harm, is not

established. [35-6] at 30-32. Indeed, "a <u>Monell</u> claim cannot succeed without an underlying

constitutional violation". <u>Mastromonaco v. County of Westchester</u>, 779 F. App'x 49, 51 (2d Cir.

2019) (Summary Order). Plaintiffs list the following as unlawful actions resulting from the

City's alleged policy or custom: the "overbroad" crime scene designation, the shutdown of

power to unrelated portions of plaintiffs' property, the exclusion of plaintiffs from the property

for two months, and the suppression of FOIL responses and "selective release of misleading

information" to the media. [29], ¶259. As I found that plaintiff stated plausible constitutional violations arising from some of these actions, I find this element satisfied.

Defendants also challenge whether plaintiffs have sufficiently alleged the existence of a municipal policy or custom. [35-6] at 31-32. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick v. Thompson, 563 U.S. 51, 61 (2011); Friend v. Gasparino, 61 F.4th 77, 93 (2d Cir. 2023). Here, plaintiffs allege that a "policy and custom of retaliatory and abusive enforcement actions" against them was demonstrated by both a pattern of conduct and by the acts of policymakers Mayor Roman and Police Chief Abbott. [29], ¶¶256, 258. Those allegations are sufficient at this stage.

Defendants do not contest that Roman or Abbott were policymakers for the City, and "even a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered' is sufficient to implicate the municipality in the constitutional deprivation for the purposes of §1983". Amnesty America v. Town of West Hartford, 361 F.3d 113, 126 (2d Cir. 2004) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481-82 (1986)). "Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy." Rookard v. Health & Hospitals Corp., 710 F.2d 41, 45 (2d Cir. 1983); see Donovan v. Norwich City School District, 2022 WL 623904, *11 (N.D.N.Y. 2022). "An official's title, though not dispositive of his authority to make policy . . . is relevant for the inferences fairly to be drawn therefrom". Rookard, 710 F.2d at 45. In the absence of facts suggesting otherwise, a plausible allegation that these high-ranking municipal officials had relevant authority suffices. See id. at 45 n.4 ("Mayors may be treated as policy-makers without proof of their specific powers and responsibilities");

Donovan, 2022 WL 623904 at *12 ("Plaintiff has plausibly alleged that the Police Chief is a final policymaker for purposes of some of the relevant events").

In addition, "[a] practice can constitute a custom under Monell when the practice is 'persistent and widespread,' or 'permanent and well settled as to constitute a 'custom or usage' with the force of law' and to 'imply the constructive knowledge of policymaking officials'." Taranto v. Putnam County, 2023 WL 6318280, *17 (S.D.N.Y. 2023) (citations omitted). The analysis of such a claim "must be context-specific and cannot be reduced to an overly simplistic analysis of the number of instances alleged". DiPippo v. County of Putnam, 2019 WL 1004152, at *9 (S.D.N.Y. 2019). In this case, plaintiffs have alleged several instances of disparate treatment by the City which, taken in conjunction with statements and actions by City officials, are sufficient at this stage to plausibly state that there was a custom and practice attributable to the City to disrupt plaintiffs' businesses interests.

For these reasons, I recommend denial of defendants' motion to dismiss as to this claim.

## J.    Tortious Interference

Plaintiffs allege that defendants' actions in shutting down the Lockport Cave interfered with various existing contractual relationships. [29], ¶¶285-90. "Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom'." Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996)).

Defendants argue that plaintiffs do not identify what contracts were allegedly breached, who the contracts were between, or how many alleged contracts were breached. [35-6] at 35-36. They also argue that plaintiffs do not allege that defendants knew about the alleged contracts or that they intentionally induced customers to breach their contracts. Id. Plaintiffs argue that the Amended Complaint's references to lost customer revenue during the summer tourist season and the unspecified "loss of business partnerships and investor confidence" was sufficient. [39-6] at 29-31 (citing [29], ¶¶30-39, 109-21). I disagree.

"While a defendant need not be aware of the details of a contract, it must have 'actual knowledge' of the contract's existence, and conclusory allegations that a defendant knew or should have known of a contract are insufficient to plead a tortious interference with contract claim." Gan v. GSUIG Real Estate Member LLC, 797 F. Supp. 3d 69, 106-07 (E.D.N.Y. 2025). "A defendant's general awareness that the plaintiff did business with third parties is not enough". Corning Inc. v. Shenzhen Xinhao Photoelectric Technology Co., 546 F. Supp. 3d 204, 212 (W.D.N.Y. 2021). Here, plaintiffs' allegations fall short of demonstrating defendants' actual knowledge of any particular contract.

There is a more fundamental problem with plaintiffs' tortious interference claim. That is, the complained-of actions by defendants (i.e., shutting down the Lockport Cave and turning off the power) are all actions taken by defendants directly against plaintiffs. "[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." Valley Lane Industries Co. v. Victoria's Secret Direct Brand Management., L.L.C., 455 F. App'x 102, 107 (2d Cir. 2012) (Summary Order) (quoting Carvel Corp. v. Noonan, 3 N.Y.3d 182, 192 (2004)). Plaintiffs do not allege that defendants took any action that was directed toward a third-

party in a contractual relationship with them. *See* <u>Toussie v. Allstate Insurance Co.</u>, 2019 WL 2435852, *18 (E.D.N.Y. 2019) ("[plaintiffs] do not allege that Allstate ever communicated with these unidentified prospective buyers; they simply argue that Allstate caused the plaintiff to 'breach a contract by preventing plaintiff's performance'"). Thus, plaintiffs do not state a claim for tortious inference.

Accordingly, I recommend that this claim be dismissed.

### K.    Defamation

Finally, plaintiffs assert a claim of defamation against all defendants for various statements made regarding plaintiffs' business operations, safety practices, and compliance with applicable laws and regulations. [29], ¶¶291-98. Defendants argue that plaintiff Callahan's failure to answer certain questions at the Section 50-h deposition precludes plaintiffs from asserting this state-law claim. [35-6] at 36-39. Defendants also argue that the statements at issue were either true or matters of opinion. <u>Id.</u> at 39-43. Plaintiffs contest consideration of the §50-h materials as outside the pleadings, but also argue that they complied with their obligations at the hearing, and have pled a case for defamation. [39-6] at 31-18.

"Compliance with a demand for a General Municipal Law §50-h examination is a condition precedent to the commencement of an action against a municipal defendant, and the failure to so comply warrants dismissal of the action." <u>Di Pompo v. City of Beacon Police Dept.</u>, 153 A.D.3d 597, 598 (2d Dept. 2017). However, "[t]he purpose of a Section 50-h examination is neither to have every question answer[ed] to a defendant's satisfaction, nor is it to duplicate discovery. The purpose is but 'to assess the general factual circumstances underlying a notice of claim,' and to allow the municipality to investigate and explore the claim's merit." <u>Williams v. City of Syracuse</u>, 2023 WL 1071437, *8 (N.D.N.Y. 2023) (citations omitted).

Here, plaintiff Callahan sat for a §50-h deposition and answered nearly all of questions posed by the City's attorney. *See* Examination of Thomas Callahan [39-2] at 1-95. Callahan was generally responsive to counsel's inquiries, and explained (at least in broad strokes) the basis of plaintiffs' claims, including defamation, and their alleged damages. *See* id. Callahan testified that City officials damaged plaintiffs by stating that they "ran an unsafe . . . and . . . dangerous operation". Id. at 53. However, plaintiff's counsel objected to certain questions about "the specifics of the safety of the boat operation" and directed Callahan not to answer them. Id. at 56, 58-59.

While I agree with defendants that Callahan's answers could have been relevant to the issue of whether plaintiffs' operation was, in fact, unsafe, I am not prepared to say that a claimant's refusal to answer questions of potential relevance to a municipal defense, without more, renders his participation in a §50-h deposition so deficient as to jurisdictionally bar him from pursuing the claim. While I do not condone claimant's attorney directing his client not to answer a question without asserting some sort of privilege or relevance objection, the full scope of disclosure and enforcement mechanisms of civil discovery are not applicable in a pre-action examination, as the City's attorney recognized. [39-2] at 56.; *see generally* Alouette Fashions, Inc. v. Consolidated Edison Co. of New York, 119 A.D.2d 481, 487 (1st Dept. 1986) ("Gen. Mun. Law § 50-h is not designed to duplicate the broad and comprehensive method of obtaining disclosure provided for in the CPLR. The purpose of the hearing, as a supplement to the notice of claim, is to afford the City an opportunity to early investigate the circumstances surrounding the accident and to explore the merits of the claim, while information is readily available, with a view towards settlement"). Callahan's participation in the §50-h deposition was sufficient to

allow the City to ascertain the nature of plaintiffs' claims and their alleged damages, and thus I find the condition precedent satisfied.

With respect to the merits, "[u]nder New York law a defamation plaintiff must establish five elements: (1) a . . . defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or *per se* actionability." Palin v. New York Times Co., 940 F.3d 804, 809 (2d Cir. 2019). "Although a jury determines if a plaintiff has been defamed, 'whether particular words are defamatory presents a legal question to be resolved by the courts in the first instance." Ganske v. Mensch, 480 F. Supp. 3d 542, 551 (S.D.N.Y. 2020) (*quoting* Celle v. Filipino Reporter Enterprises, 209 F.3d 163, 177 (2d Cir. 2000)).

Plaintiffs identify five "statements" by the various defendants that they allege to be defamatory. The first is a statement by Police Chief Abbott from the day of the incident:

> "We have one individual who has passed, we have a lot of questions that need to be answered. Whether or not that leads to charges in the future, I do not know, but as of right now we're treating it as a crime scene." [29], ¶146.

While plaintiffs concede that Abbott's statement is true on its face, they argue that the statement "falsely implied that Plaintiffs were criminally responsible for the incident". [39-6] at 36.

"[F]alsity—or lack of substantial truth—is an element of a New York defamation claim, [and] it follows that a plaintiff must plead facts demonstrating falsity to prevail on a motion to dismiss the complaint in federal court." Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC, 864 F.3d 236, 247 (2d Cir. 2017). Conversely, a statement that is "substantially true" cannot be the basis of a defamation claim. Id. at 242-47. "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm

has been done." Id. (*quoting* <u>Fleckenstein v. Friedman</u>, 266 N.Y. 19, 23 (1934)). That is because

"[t]he libel law is not a system of technicalities, but reasonable regulations whereby the public

may be furnished news and information, but not false stories about any one". <u>Id.</u> (*quoting*

<u>Cafferty v. Sothern Tier Publishing Co.</u>, 226 N.Y. 87, 93 (1919)).

    Abbott's alleged statement was substantially true. Whether or not his statement

was susceptible to the implication that criminal conduct had occurred, Abbott merely recounted

what he knew at the time and what his department was doing. While plaintiffs contest whether

Abbott's designation of the premises as a "crime scene" was justified, their dispute is with the

designation itself – not Abbott's (accurate) statement that he had so designated the premises.

Furthermore, a "[q]ualified privilege applies to a statement 'when it is fairly made by a person in

the discharge of some public or private duty, legal or moral, or in the conduct of his own affairs,

in a matter where his or her interest is concerned". <u>Yoo v. Choi</u>, 210 A.D.3d 1062, 1063 (2d

Dept. 2022); *see* <u>Lee v. City of Rochester</u>, 254 A.D.2d 790, 791-92 (4th Dept. 1998) ("a police

officer may give details of past and present incidents that would interest or affect the public. . . .

[such a statement] is protected by a qualified privilege"). When the qualified privilege applies, it

is the plaintiff's burden to show "actual malice". <u>Virk v. Kaleida Health</u>, 227 A.D.3d 1422, 1425

(4th Dept. 2024). Plaintiffs' allegations do not support such a showing.

    The alleged statements by Dool fall into the same category. On June 13, 2023,

Dool stated:

> "We found a broken conduit that left wiring exposed, including to water; areas
> where the wrong wiring was used; and a rusted panel box." [29], ¶159.

On August 28, 2023, after plaintiffs announced that they were reopening certain walking tours,

Dool stated:

To my knowledge, they have not corrected any of the electrical issues that were identified in the cave. Id., ¶162.

Regarding both statements, plaintiffs allege that Dool's statements "falsely suggested" that plaintiffs' facilities contained dangerous electrical hazards. Id., ¶¶160, 164. Again, however, plaintiffs do not allege that the statements were actually false. Whether or not the statements might suggest that those conditions are dangerous to the public, the substantial truth of the statements is uncontested. Moreover, as Dool was the Building Inspector and was speaking in that capacity, a qualified privilege applies to these comments.

The alleged statements by Common Council President Beakman are a different story. On August 28 and August 29, 2023, Beakman allegedly made the following statements:

"If you go back to the day of the incident, it was really chilling to have to see the police chief and fire chief claw through that wall with their bare hands to help initiate the rescue." [29], ¶165.

"There's gotta be proper safety measures in place." Id., ¶167.

"The owner was proposing that they do Lantern tours. It's just not a safe thing to do. There's no lit emergency exits. There still is only the exits down below." Id., ¶169.

With respect to the first and third statements, plaintiffs here allege that the information contained therein is materially false, i.e., that no emergency responders "clawed through walls" and that plaintiffs had emergency exits in place.[5] Id., ¶¶166, 170. These allegations suffice, at this stage, to state a claim that Beakman made false and defamatory statements. Whether a qualified privilege applies to Beakman is less clear, and, in any event, that argument is not pursued by defendants. Thus, I would allow the defamation claim to continue as to those statements by Beakman.

---

[5]    Notably, plaintiffs do not allege that they had "lit" emergency exits in place. See [29], ¶¶170.

Finally, plaintiffs reference the release of what they describe to be a "selectively edited" video depicting plaintiff Callahan tearing up employee time sheets. [39-6] at 34; [29], ¶¶95-100. Plaintiffs allege that the City disclosed this footage to a local media outlet in response to a FOIL request, and that the footage was used in a news story to falsely suggest Callahan was destroying evidence related to the June 12th incident. [29], ¶¶95, 96.

Initially, I agree with plaintiffs that the publication of selectively edited video can, assuming all other elements are satisfied, support a claim for defamation. *See*, *e.g.*, <u>Corporate Training Unlimited, Inc. v. National Broadcasting Co., Inc.</u>, 868 F. Supp. 501, 507 (E.D.N.Y. 1994) ("[c]ourts must scrutinize the juxtaposition of the audio and video portions of a television program. In subtle ways, [the creator of a video] can alter the tone of an otherwise innocuous [recording] . . . . a clever amalgamation of half-truths and opinion-like statements, adorned with orchestrated images and dramatic audio accompaniment, can be devastating when packaged in the powerful [visual] medium").

However, plaintiffs did not expressly reference this allegation in their defamation cause of action, instead citing to "numerous public statements and comments to the media" discussed above as being the basis of that claim. *See* <u>id.</u>, ¶292. The allegation is found in the Amended Complaint under subheading "D. The City's Abuse of FOIL to Suppress Plaintiffs' Access to Information" ([29] at 20), which is separate from subheading "G. False and Defamatory Statements by the City of Lockport and its Officials". <u>Id.</u> at 28. Defendants do not address the provision of allegedly edited video in their motion to dismiss, nor would a reasonable reading of the Amended Complaint lead to the understanding that such a claim had been asserted.

Therefore, I recommend that the defamation claim be dismissed, except as to the statements by defendant Beakman.

**L.    Motion to Strike**

Plaintiffs cross-move to strike or exclude various attachments to defendants' motion as being matters outside the pleadings which are improper to consider on a Rule 12(b)(6) motion. [39-6] at 3-4. I agree with plaintiffs that, on such a motion, a court should generally limit its consideration to the allegations in the complaint, documents attached to or integral to the complaint, or matters of which judicial notice may properly be taken. *See* Chambers v. Time Warner, Inc., 282 F.3d 147, 152-54 (2d Cir. 2002); *see* Ge Dandong v. Pinnacle Performance Ltd., 966 F. Supp. 2d 374, 388 (S.D.N.Y. 2013) ("because the Court declines to convert [defendant's] motion into one for summary judgment, the Court will not consider the evidence [defendant] submitted . . . namely, excerpts of the June 21, 2012 deposition"); Doe v. City of New York, 2018 WL 3824133, *5 (E.D.N.Y. 2018) ("the greater weight of authority in this circuit excludes 50-h hearing testimony from consideration on a motion to dismiss unless there is evidence that the plaintiff relied on the 50-h hearing testimony in drafting her complaint").

Of those additional materials, I have considered only Callahan's §50-h deposition transcript, and only to the extent required to determine whether plaintiff complied with his jurisdictional obligations. Thus, I deny his motion to strike on that limited grounds, and otherwise deny the motion as moot.

**CONCLUSION**

For the above reasons, I recommend the motion to dismiss [35] be granted as to plaintiffs' first (procedural due process), second (substantive due process), third (takings), fourth (conspiracy), and eighth cause of action (tortious interference); and denied as to their fifth (first amendment retaliation) and sixth cause of action (municipal liability). As for the plaintiffs' seventh cause of action for unreasonable search and seizure, I recommend the motion be granted as to defendants Roman and Beakman but otherwise denied. As to the ninth cause of action for defamation, I recommend that the motion be granted except as to the statements by defendant Beakman. Plaintiffs' motion to strike [39] is denied.

Unless otherwise ordered by District Judge Sinatra, any objections to this Report and Recommendation must be filed with the clerk of this court by February 5, 2026. Any requests for extension of this deadline must be made to Judge Sinatra. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new

arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply

with these provisions may result in the district judge's refusal to consider the objections.

Dated: January 22, 2026

                                        /s/ Jeremiah J. McCarthy
                                        JEREMIAH J. MCCARTHY
                                        United States Magistrate Judge